IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-80

 No. 311A20

 Filed 13 August 2021

 IN THE MATTER OF THE APPEAL OF: HARRIS TEETER, LLC from the decision
 of the Mecklenburg County Board of Equalization and Review

 Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of

 the Court of Appeals, 271 N.C. App. 589 (2020), affirming a Final Decision entered

 on 30 May 2019 by the North Carolina Property Tax Commission. Heard in the

 Supreme Court on 27 April 2021.

 John A. Cocklereece, Justin M. Hardy, and Kyle F. Heuser for appellant-
 taxpayer Harris Teeter, LLC.

 Ruff Bond Cobb Wade & Bethune, LLP, by Ronald L. Gibson and Robert S.
 Adden, Jr., for appellee Mecklenburg County.

 ERVIN, Justice.

¶1 This case requires consideration of the extent to which the Court of Appeals

 erred by holding that an assessment that Mecklenburg County made of the business

 personal property owned by Harris Teeter, LLC, at six grocery stores reflected the

 “true value” of that property as required by N.C.G.S. § 105-283, which defines “true

 value” as the price “at which the property would change hands between a willing and

 financially able buyer and a willing seller, neither being under any compulsion to buy

 or to sell and both having reasonable knowledge of all the uses to which the property

 is adapted and for which it is capable of being used.” After careful consideration of
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 the record in light of the applicable law, we conclude that the Court of Appeals’

 decision should be affirmed.

¶2 In 2015, Mecklenburg County completed an ad valorem tax assessment of

 Harris Teeter’s business personal property, with the property in question having

 included shelving, coolers, freezers, point-of-sale systems, computers and computer

 equipment, forklifts, trash compactors, and other items used in the operation of six

 of the Harris Teeter grocery stores located in Mecklenburg County.1 Although the

 County assessed the value of the business personal property utilized at the six stores

 at $21,434,313.00, Harris Teeter contended that the “true value” of the property in

 question was only $13,663,000.00. As a result, Harris Teeter noted an appeal from

 the County’s tax assessment to the North Carolina Property Tax Commission. On 5

 March 2019, the Commission, sitting as the State Board of Equalization and Review,

 conducted a hearing concerning Harris Teeter’s appeal.

¶3 At the hearing, Kenneth Joyner, a tax assessor employed by Mecklenburg

 County who had worked on the initial assessment of the value of the relevant

 property, testified that, in order to generate this initial valuation, the County had

 identified the appropriate cost indices and depreciation schedules and utilized

 1 In advance of the hearing that was held before the Commission, the parties
 stipulated that they would limit their evidentiary presentations to property located at the six
 stores that the County had previously assessed given that the stores in question were
 representative of the other stores that Harris Teeter operated in Mecklenburg County.
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 computer software to apply those indices and schedules to the original cost of Harris

 Teeter’s property. Mr. Joyner testified that, in performing this analysis, the County

 adhered to North Carolina Department of Revenue schedules and did not include any

 depreciation-related allowances for obsolescence or consider any other market value-

 related information. Mr. Joyner acknowledged that the North Carolina Department

 of Revenue advised that the relevant schedules had “been prepared [ ] as a general

 guide to be used in the valuation of business personal property” and that there “may

 be situations where the appraiser will need to make adjustments for additional or

 less functional or economic obsolescence or for other factors.”

¶4 Mitchell Rolnick, a machinery and equipment appraiser, testified on behalf of

 Harris Teeter. Mr. Rolnick stated that he had completed a separate appraisal of the

 subject property at Harris Teeter’s request using market value-based depreciation

 schedules developed by Landmapp, a private appraisal company, in order to

 determine the true value of the property in question. The depreciation schedules

 developed by Landmapp rested upon information concerning sales of used equipment

 that were primarily made on eBay or other similar e-commerce websites. Mr. Rolnick

 testified that he took the original cost of the equipment, “index[ed] it to today’s

 dollar,” and applied Landmapp’s depreciation schedules “to come to the fair market

 value installed.” Mr. Rolnick refrained from including additional depreciation based

 upon considerations relating to functional or economic obsolescence on the theory that
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 such factors were captured in the prices reflected in the underlying market

 transactions. Although Mr. Rolnick agreed that the Department of Revenue’s

 schedules would capture physical deterioration, he believed that the marketplace was

 “the only place you’re going to find” functional and economic obsolescence, which

 explained why Landmapp had used the prices resulting from market transactions in

 developing its depreciation schedules. Mr Rolnick acknowledged that, in general,

 used grocery store equipment either went “to liquidation or [ ] in the dumpster” at

 the end of its useful life.

¶5 According to Mr. Rolnick, in completing his appraisal, he and his colleagues

 had conducted a physical inventory of the property located at the six stores that were

 at issue in this case and then searched the Landmapp database, along with

 information available in other publications and on the internet, for the purpose of

 identifying sales of comparable property. Mr. Rolnick stated that he did not utilize a

 “sales comparison” approach given that “significant amounts of adjustments would

 need to be made” in order to make it viable, but that he used a “market-derived cost

 approach,” in which he compared the price obtained for the property in question in

 the marketplace to the price of the same piece of equipment when purchased new,

 given that this approach “took less adjustments to be credible.”

¶6 James Turner, the president of a business appraisal company, provided

 rebuttal testimony for the County. After conducting an appraisal of the relevant
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 property, Mr. Turner concluded that the property had a “true value” of

 $22,100,000.00. In order to reach this result, Mr. Turner went to the relevant grocery

 stores, photographed the equipment that was located at those facilities, and collected

 information about the equipment from the store managers. Mr. Turner used

 depreciation tables developed by Marshall & Swift to account for the physical

 deterioration of the equipment, indexed the cost of the equipment using the Producer

 Price Index, and developed values for the equipment using (1) the cost approach; (2)

 the market, or “comparable sales,” approach; and (3) the income approach.

¶7 Mr. Turner testified that he had been able to use the market, or “comparable

 sales,” approach to appraise the value of some of the equipment, such as shopping

 carts and forklifts, given that such items were relatively mobile, self-contained, and

 occasionally re-sold on an individual basis. Mr. Turner testified that, on the other

 hand, larger items of equipment, such as refrigerated cases, coolers, and shelving,

 were “tethered to the rack compressor system” and had to operate using the same

 refrigerant, resulting in the existence of higher installation costs and fewer

 incidences of re-sale that served to make the market approach “less reliable” in

 valuing these items.

¶8 In describing his use of the cost approach, Mr. Turner testified that he used

 Marshall & Swift valuation tables to account for physical deterioration and for

 functional obsolescence relating to certain computers, point-of-sale systems, and
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 other computing equipment. Mr. Turner used the income approach to determine

 whether an additional adjustment needed to be made as the result of economic

 obsolescence and found that “the subject stores return[ed] a rate of return on their

 assets and on equity that [we]re above industry standards” and that the available

 information concerning the Harris Teeter stores “reflected a robust return on invested

 capital.” In view of the fact that the return that Harris Teeter earned on the subject

 property was “above industry norms,” Mr. Turner concluded that the “equipment

 didn’t suffer any external obsolescence,” i.e. economic obsolescence.2 After stating

 that he had not “consider[ed] [Harris Teeter’s] earnings when [he] was valuing the

 equipment independently,” Mr. Turner acknowledged that he “did use [Harris

 Teeter’s] earnings to determine whether or not there was economic obsolescence

 within the cost approach.”

¶9 On 12 March 2019, the Commission entered an order in which it requested

 that both parties provide written answers to several questions, including the extent

 to which delivery and installation costs “are or are not an appropriate component of

 true value” and the “degree [to which] obsolescence is reflected in your opinion of

 value, and the dollar value attributed to any such obsolescence.” In responding to the

 2 In explaining the concept of economic obsolescence, Mr. Turner stated that, when

 NAFTA was adopted, the textile industry had experienced economic obsolescence because
 many companies moved offshore and income in the industry was much lower than had been
 expected.
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 Commission’s question regarding delivery and installation costs, Harris Teeter cited

 to a manual concerning “Personal Property Appraisal and Assessment” that had been

 published by the North Carolina Department of Revenue in 2007.

¶ 10 On 30 May 2019, the Commission entered a Final Decision affirming the

 County’s initial assessed valuation. The Commission noted that both parties had

 used the cost approach to generate values for the subject property by determining the

 “original installed costs for each item of the subject property” and adjusting those

 costs “to reach an estimate of true value as of January 1, 2015.” According to the

 Commission, the principal explanation for the varying valuation amounts provided

 by the parties stemmed from differing cost adjustment and depreciation

 methodologies. In addressing these methodological issues, the Commission found

 that Mr. Rolnick “had relied upon the sales of used equipment, without making any

 adjustments,” to calculate depreciation, despite the fact that he had “abandoned the

 sales comparison approach” for the purpose of valuing the relevant property in light

 of the significant adjustments that would be necessary in order to utilize such an

 approach. The Commission described Mr. Rolnick’s approach as “illogical” given that,

 on the one hand, he “determine[d] that sales [were] too unreliable to be useful in

 developing value using the sales comparison approach” while, on the other hand, he

 used “the same or similar” sales values “under the cost approach to determine the

 appropriate level of depreciation to apply.” In addition, the Commission determined
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 that Harris Teeter’s proposed valuation method did not adequately account for

 delivery and installation costs on the theory that, “[i]f the basis for determining true

 value under the cost approach is the total cost required to put equipment to its

 intended use, then a resale of used equipment must also include installation and

 other necessary costs.”

¶ 11 The Commission rejected Harris Teeter’s argument that the County’s

 valuation methodology inappropriately failed to account for functional and economic

 obsolescence on the grounds that the County had adequately addressed this subject.

 After noting that there were three types of depreciation, including (1) physical

 depreciation; (2) functional obsolescence, which consisted of “the decline in an object’s

 value due to outdated or flawed design”; and (3) economic obsolescence, which

 consisted of “the decline in an object’s value due to external economic forces,” the

 Commission found that the County had adequately accounted for physical

 deterioration, with “all or nearly all of the depreciation affecting the subject property

 [having been] the result of physical deterioration.” In addition, the Commission

 found that, while “some assets exhibit[ed] functional obsolescence,” the County had

 accounted for this sort of obsolescence in its valuation methodology and that Harris

 Teeter had “effectively limited the impact of functional obsolescence on its equipment

 through a program of regularly replacing it.” Finally, with respect to the issue of

 economic obsolescence, the Commission found that the “evidence [did not tend to
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

show] that [Harris Teeter] is itself closing stores as a result of economic conditions.”

In addressing both functional and economic obsolescence, the Commission stated

that:

 15. Mr. Turner testified that he identified additional
 functional obsolescence in computer-based equipment
 and further depreciated the value of those assets in
 order to account for the additional loss in value. He
 testified that he accelerated the depreciation on
 certain types of equipment as a result of information
 he received from the Appellant’s staff—that some
 equipment was replaced before the end of its normal
 useful life because of severe use of that equipment. . . .
 Mr. Turner testified further that he had personally
 developed income-based values in order to determine
 for himself whether the subject property was
 producing an appropriate return for the Appellant,
 and determined that the subject property produced
 income greater than standard for the industry. His
 conclusion, therefore, is that the subject property does
 not exhibit economic obsolescence, and we agree. The
 property’s apparent capacity to generate income
 greater than the industry standard is not an
 indication of economic obsolescence.

After finding that the County had correctly refrained from adjusting the value of the

relevant property to account for economic obsolescence and that the County had

properly accounted for physical depreciation and functional obsolescence in its

assessment, the Commission concluded that the County’s tax valuation was “a

reasonable estimate of true value” for the subject property and that, even though

Harris Teeter had successfully rebutted the County’s initial showing of correctness

by offering evidence tending to show that the County’s initial valuation exceeded the
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 “true value” of the relevant property, the County had satisfied its ultimate burden of

 proving that its appraisal reflected the “true value” of the property. Harris Teeter

 noted an appeal from the Commission’s Final Decision to the Court of Appeals.

¶ 12 In seeking relief from the Commission’s Final Decision before the Court of

 Appeals, Harris Teeter argued that: (1) the Commission had erred by failing to find

 that the market for used grocery store equipment could be used to identify

 obsolescence given that market results “necessarily provide[ ] valuable evidence of

 economic and functional obsolescence”; (2) the Commission had erred by affirming

 the County’s valuation of the relevant property based upon the value of its use by the

 taxpayer rather than its “fair market value,” which is the “price at which the property

 would likely change hands between a willing buyer and a willing seller,” citing In re

 Parkdale Mills, 225 N.C. App. 713, 720 (2013); and (3) the Commission had erred by

 concluding that the County had demonstrated that its assessment reflected the “true

 value” of the relevant property. In rejecting Harris Teeter’s challenge to the

 Commission’s order, the Court of Appeals began by holding that Harris Teeter had

 successfully rebutted the presumption of validity to which the County’s initial

 appraisal was entitled by presenting competent evidence that the methodology used

 to develop the County’s initial appraisal methods did not result in the “true value” of

 the relevant property. In re Harris Teeter, LLC, 271 N.C. App. 589, 601 (2020). In

 addition, the Court of Appeals held that the Commission’s findings had sufficient
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 evidentiary support and that those findings established that the County had satisfied

 its obligation to prove that the methods that it had employed in valuing Harris

 Teeter’s property produced the “true value” of that property. Id. In reaching this

 result, the Court of Appeals noted that, while both the County and Harris Teeter had

 used the cost approach to determine the value of the relevant property, “the parties

 disagree[d] concerning the degree to which functional and economic obsolescence

 should be considered and used to further adjust appraisal values for additional

 depreciation” of the property. Id. at 602.

¶ 13 The Court of Appeals determined that the cost approach could properly be

 utilized to determine the value of business personal property based upon a

 determination of the initial cost of that property reduced by an allowance for

 depreciation. Id. at 601–02. According to the Court of Appeals, “[d]epreciation may

 be caused by deterioration, which is a physical impairment, such as structural

 defects, or by obsolescence, which is an impairment of desirability or usefulness

 brought about by changes in design standards (functional obsolescence) or factors

 external to the property (economic obsolescence).” Id. at 602 (citing In re Stroh

 Brewery, 116 N.C. App. 178, 186 (1994)). In addition, the Court of Appeals defined

 “functional obsolescence” as “a loss in value due to impairment of functional capacity

 inherent in the property itself including factors such as overcapacity, inadequacy or

 changes in state of the art, or poor design.” Id. at 603 (citing In re Westmoreland-LG
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 & E Partners, 174 N.C. App. 692, 699 (2005)). In evaluating whether the Commission

 had correctly found that the County appropriately considered the issue of functional

 obsolescence, the Court of Appeals noted that Mr. Turner had “identified additional

 functional obsolescence in computer-based equipment” and made an appropriate

 adjustment in light of the degree of functional obsolescence that he had observed and

 that he had also “accelerated the depreciation on certain types of equipment as a

 result of information he received . . . that some equipment was replaced before the

 end of its normal useful life because of severe use of that equipment.” Id. In addition,

 the Court of Appeals pointed out that the Commission had “f[ou]nd no evidence in the

 record to suggest that the equipment in question (collectively) is failing to perform

 adequately the job for which it was intended due to design or economic factors.” As a

 result, the Court of Appeals held that the Commission did not err in determining that

 the County had properly accounted for functional obsolescence. Id. at 604.

¶ 14 Similarly, the Court of Appeals held that the “Commission’s findings [relating

 to economic obsolescence] were supported by competent evidence and adequately

 address[ed] why consideration of the market for used grocery store equipment was

 inappropriate and did not warrant [the making of an] additional downward

 adjustment” in determining the “true value” of the relevant property. Id. at 605. The

 Court of Appeals held that the Commission had appropriately determined that the

 market prices paid for used grocery store equipment were not adequate indicators of
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 economic obsolescence given that, “due to the prevailing industry trend of store

 closures flooding the supply in the secondary market for used equipment, the prices

 fetched by such sales do not represent transactions from ‘willing sellers’ of the

 equipment as mandated by N.C.[G.S.] § 105-283.” Id. at 606. In addition, the Court

 of Appeals held that Harris Teeter’s approach of “assum[ing] that each piece of

 equipment is due for replacement and headed to either the landfill or the glutted

 secondary market at the moment it is valuated” was erroneous and that the adoption

 of this assumption “would result in its equipment experiencing a drastic reduction in

 value the moment they are purchased new and installed in its stores.” Id. As a result,

 the Court of Appeals affirmed the Commission’s order.

¶ 15 In a separate opinion concurring in the result, in part, and dissenting, in part,

 Judge Tyson expressed disagreement with the Court of Appeals’ determination that

 the County had successfully established that the appraisal methodologies that it had

 used established the “true value” of the relevant property as required by N.C.G.S.

 § 105-283. Id. at 609. According to Judge Tyson, the valuation adopted by the

 County’s valuation was “substantially greater” than that proposed by Harris Teeter

 and “substantially exceed[ed] true value.” Id. at 613–14. In support of this assertion,

 Judge Tyson pointed to Mr. Rolnick’s testimony that “low market prices for used

 grocery store equipment necessitated downward adjustment of any values estimated

 by depreciation schedules to reflect additional economic and functional obsolescence”
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 and asserted that this portion of the evidence had not been “disputed nor rebutted by

 the County.” Id. at 616. As a result, Judge Tyson concluded that, since neither the

 County nor Mr. Turner had properly accounted for economic and functional

 obsolescence, the Commission’s conclusions were “arbitrary, unlawful, and . . . wholly

 inconsistent with long-established definitions, precedents, and attributes governing

 personal property.” Id.

¶ 16 In seeking to persuade us to overturn the Court of Appeals’ decision, Harris

 Teeter argues that, after it had demonstrated that the County’s valuation was

 unreasonably high and shifted the burden of proof with respect to the “true value”

 issue to the County, the County had failed to prove that its appraisal methods

 resulted in the establishment of the “true value” of the relevant property and had not,

 for that reason, satisfied the applicable burden of proof. More specifically, Harris

 Teeter argues that the valuation procedures utilized by the County failed to establish

 the “true value” of the relevant property because those methods did not properly

 account for functional and economic obsolescence. Harris Teeter claims to have

 elicited substantial evidence concerning “economic conditions that put significant

 downward pressure on the fair market value of used grocery store equipment” and

 that this evidence indicated that the relevant property was subject to both functional

 and economic obsolescence. In support of this proposition, Harris Teeter notes that,

 “in 2013 and 2014, there were 5,500 mergers and acquisitions of grocery stores in the
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 United States and 869 bankruptcies and closures” and points out that Harris Teeter

 “and its competitors remodel their stores — on average, every six to seven years —

 as they compete for consumers,” with both of these developments having flooded the

 market for used grocery store equipment. In Harris Teeter’s view, “[t]his glut of used

 grocery store equipment inevitably affects the fair market value of the Property,” with

 the County having failed to assess the property at issue in this case at its “true value”

 given its failure to account for this functional and economic obsolescence.

¶ 17 In addition, Harris Teeter directs our attention to In re IBM Credit Corp., 201

 N.C. App. 343, 350–51 (2009) (IMB II), in which the Court of Appeals reversed a

 Commission order upholding the manner in which Durham County had assessed the

 value of business personal property owned by IBM, in part, on the grounds that the

 Commission’s finding that the County had properly considered obsolescence by

 relying upon a government depreciation schedule was erroneous given the absence of

 sufficient record support for that finding. According to the Court of Appeals, the

 County’s “failure to make additional depreciation deductions due to functional and

 economic obsolescence due to market conditions result[ed] in an appraisal which [did]

 not reflect ‘true value.’ ” Id. At 354. Harris Teeter contends that, in this case, as in

 IBM II, the County simply failed to “produce a valid explanation for its failure to

 make the required adjustments, only producing appraisals that do not rebut [Harris
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 Teeter]’s evidence of significant economic and functional obsolescence affecting the

 Property.”

¶ 18 Secondly, Harris Teeter argues that the Court of Appeals incorrectly

 interpreted the relevant statutory language, which provides that:

 All property, real and personal, shall as far as practicable
 be appraised or valued at its true value in money. When
 used in this Subchapter, the words “true value” shall be
 interpreted as meaning market value, that is, the price
 estimated in terms of money at which the property would
 change hands between a willing and financially able buyer
 and a willing seller, neither being under any compulsion to
 buy or to sell and both having reasonable knowledge of all
 the uses to which the property is adapted and for which it
 is capable of being used.

 N.C.G.S. § 105-283 (2019). In Harris Teeter’s view, the value of the relevant property

 for property tax valuation purposes should rest upon the price of used grocery store

 equipment, which is, quite literally, the price which a willing buyer would pay for the

 equipment to a willing seller, with the Court of Appeals’ determination that the use

 of market prices was “inappropriate” for the purpose of determining the “true value”

 of used grocery store equipment being fundamentally flawed.

¶ 19 In addition, Harris Teeter takes issue with the Court of Appeals’ determination

 that the Commission appropriately considered its favorable economic performance

 vis-à-vis that of its competitors in determining whether the value of the relevant

 property should be reduced to account for functional or economic obsolescence. In

 Harris Teeter’s view, the Commission’s belief that the property in question “must
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 have a higher value than other used grocery store equipment because [Harris Teeter]

 uses it well in its business operations” rests upon its “subjective worth” to the

 taxpayer, an approach that the Court of Appeals disavowed in Parkdale Mills, 225

 N.C. App. at 720, by stating that the “Commission’s findings implicitly allow the

 County to measure the value of the properties as their subjective worth to” the

 taxpayer, a standard of valuation that was “obviously not the same as adequately

 determining the objective value of these properties to another willing buyer.” Id.

 (citing In re AMP, Inc., 287 N.C. 547, 568 (1975)).

¶ 20 The County, on the other hand, argues that the Court of Appeals correctly held

 that the Commission’s findings of fact had sufficient record support and provided

 ample justification for the Commission’s conclusions of law. The County claims to

 have presented evidence tending to show that its initial valuation captured the “true

 value” of the relevant property, with this evidence including the appraisal completed

 by Mr. Turner, who reduced his estimate of the value of some of Harris Teeter’s

 computer-related property based upon a finding of functional obsolescence and failed

 to find any evidence that any of the relevant property was economically obsolete given

 that Harris Teeter achieved above-average income using the relevant property.

¶ 21 According to the County, the Court of Appeals correctly upheld the

 Commission’s decision to reject the arguments advanced on Harris Teeter’s behalf in

 Mr. Rolnick’s testimony. The County contends that the Court of Appeals was not
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 entitled to “re-weigh the evidence presented and substitute its evaluation for the

 Commission’s,” which is what, in the County’s view, Harris Teeter was seeking to

 have it do. Instead, the County asserts that the issue for the Court of Appeals and

 this Court on appellate review is “whether an administrative decision has a rational

 basis in the evidence,” citing In re McElwee, 304 N.C. 68, 87 (1981). In arguing that

 the Commission had a rational basis in the evidence for its decision, the County

 directs our attention to Mr. Turner’s use of the cost approach, the manner in which

 he depreciated certain items of property, and the income-based values that Mr.

 Turner used in determining whether a further deduction for economic obsolescence

 would be appropriate. As a result, for all of these reasons, the County urges us to

 affirm the Court of Appeals’ decision.

¶ 22 In evaluating whether the Commission “properly accepted [the] County’s

 method of valuing [a taxpayer’s property] rather than the method offered by [the]

 taxpayer, we use the whole-record test to evaluate the conflicting evidence.” In re

 Greens of Pine Glen Ltd., 356 N.C. 642, 647 (2003). As we have consistently noted,

 it is the function of the administrative agency to determine
 the weight and sufficiency of the evidence and the
 credibility of the witnesses, to draw inferences from the
 facts, and to appraise conflicting and circumstantial
 evidence. We cannot substitute our judgment for that of
 the agency when the evidence is conflicting. However,
 when evidence is conflicting, as here, the standard for
 judicial review of administrative decisions in North
 Carolina is that of the “whole record” test. . . . The whole
 record test is not a tool of judicial intrusion; instead, it
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 merely gives a reviewing court the capability to determine
 whether an administrative decision has a rational basis in
 the evidence.

 In re McElwee, 304 N.C. at 87 (cleaned up). In conducting “whole record” review, we

 are required to “evaluate the conflicting evidence” and determine “whether the

 Commission properly accepted [the] County’s method of valuing” the property rather

 than that proffered by the taxpayer. In re Greens of Pine Glen Ltd., 356 N.C. at 647.

 The “whole record” test does not, of course, allow a reviewing court to “replace the

 Commission’s judgment with its own judgment even if there are two reasonably

 conflicting views; rather, [the reviewing court] merely determine[s] whether an

 administrative decision has a rational basis in evidence.” In re Westmoreland, 174

 N.C. App. at 697 (citing In re Perry-Griffin Found., 108 N.C. App. 383, 393 (1993)).

 For that reason, the reviewing court simply “evaluate[s] whether the Commission’s

 decision is supported by substantial evidence,” which is “such relevant evidence as a

 reasonable mind might accept as adequate to support a conclusion.” Id. (citing Comr.

 of Ins. v. Rating Bureau, 292 N.C. 70, 80 (1977)) (cleaned up).

¶ 23 According to N.C.G.S. § 105-283, business personal property must be appraised

 for property taxation purposes at its “true value in money,” defined, as has already

 been noted, as the property’s “market value, that is, the price estimated in terms of

 money at which the property would change hands between a willing and financially

 able buyer and a willing seller.” According to well-established North Carolina law,
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 when interpreting a statute, “undefined words are accorded their plain meaning so

 long as it is reasonable to do so.” Polaroid Corp. v. Offerman, 349 N.C. 290, 297

 (1998). As a result, the statutory description of “true value” and the manner in which

 it is defined should be interpreted in accordance with the ordinary meaning of the

 relevant terms, a fact that clearly suggests the appropriateness of ordinary valuation

 methods in determining the “true value” of the relevant property.

¶ 24 “[A]d valorem tax assessments are presumed to be correct”; when “such

 assessments are attacked or challenged, the burden of proof is on the taxpayer to

 show that the assessment was erroneous.” In re AMP, Inc., 287 N.C. at 562. In order

 to rebut this presumption of correctness, the taxpayer must “produce ‘competent,

 material and substantial’ evidence that tends to show that: (1) Either the county tax

 supervisor used an arbitrary method of valuation; or (2) the county tax supervisor

 used an illegal method of valuation; AND (3) the assessment substantially exceeded

 the true value in money of the property.” Id. at 563. “An illegal appraisal method is

 one which will not result in ‘true value’ as that term is used in [N.C.G.S.] § [105-]283.”

 In re S. Ry. Co., 313 N.C. 177, 181 (1985). In order to show that the County’s initial

 assessment “substantially exceeded the true value in money of the property,” the

 taxpayer must show that “the valuation was unreasonably high.” In re AMP, 287

 N.C. at 563. In the event that the taxpayer satisfies its initial burden of proving that

 the County’s valuation was unreasonably high, the County is then required to
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 “demonstrate [ ] that the values determined in the revaluation process were not

 substantially higher than that called for by the statutory formula” and “demonstrate

 the reasonableness of its valuation ‘by competent, material and substantial

 evidence.’ ” In re McElwee, 304 N.C. at 86–87 (citation omitted); see also In re

 Parkdale Mills, 225 N.C. App. at 717 (holding that, “[o]nce the taxpayer rebuts the

 initial presumption, the burden shifts back to the County which must then

 demonstrate that its methods produce true values”).

¶ 25 The record reflects that both Harris Teeter and the County utilized the cost

 approach in order to appraise the relevant property.3 The cost approach “is the most

 effective methodology for the appraisal of personal property.” North Carolina Dept.

 of Revenue Ad Valorem Tax Division, 2007 Personal Property Appraisal and

 Assessment Manual Section VIII: The Appraisal of Business Personal Property, 14

 (2007) [hereinafter NCDOR Manual Section VIII].4 Given that business personal

 3 As the record clearly reflects, neither party argued before the Commission or before

 this Court that the Commission was required to value the relevant business personal
 property on the exclusive basis of the prices charged for such property in the secondary
 market. Instead, the only purpose for which Harris Teeter proposed the use of secondary
 market prices was to determine the extent, if any, to which the original cost of the property
 should be reduced for economic obsolescence.
 4 A portion of this manual was included in Harris Teeter’s response to an Order of the

 Commission and in the record developed before the Court of Appeals. The manual can be
 found at: https://www.ncdor.gov/documents/2007-personal-property-appraisal-and-
 assessment-manual-section-viii-appraisal-business-personal. In view of the fact that this
 manual reflects the ordinary meaning of the statutory definition of “true value” set out in
 N.C.G.S. §105-283, it is appropriate for this Court to consider that document, upon which
 Harris Teeter relied before the Commission and the Court of Appeals, in evaluating the
 validity of the order that is before us in this case.
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 property, such as machinery and equipment, is “not traded regularly in the market”

 and that it is rare for “business taxpayers [to] purchase new equipment merely to

 update to the latest model available,” “the cost (accounting method) approach is the

 recommended method for the valuation of business personal property.” Id. An

 analyst should account for depreciation in utilizing the cost approach by

 estimating the current cost of a new asset, then deducting
 for various elements of depreciation, including physical
 deterioration and functional and external obsolescence to
 arrive at “depreciated cost new.” The “cost” may be either
 reproduction or replacement cost. The logic behind this
 method is that an indication of value of the asset is its cost
 (reproduction or replacement) less a charge against various
 forms of obsolescence such as functional, technological and
 economic as well as physical deterioration if any.

 IBM II, 201 N.C. App. at 351. “Depreciation may be caused by deterioration, which

 is a physical impairment such as structural defects, or by obsolescence, which is an

 impairment of desirability or usefulness brought about by changes in design

 standards (functional obsolescence) or factors external to the property (economic

 obsolescence).” In re Stroh Brewery, 116 N.C. App. at 186 (cleaned up). In view of the

 fact that Harris Teeter does not appear to contend that the Commission failed to

 properly address the issue of physical impairment, we will focus the remainder of our

 analysis upon issues surrounding functional and economic obsolescence.

¶ 26 As a definitional matter, functional obsolescence is “a loss in value due to

 impairment of functional capacity . . . inherent in the property itself” stemming from
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 factors such as “overcapacity, inadequacy or changes in state of the art, or poor

 design.” In re Westmoreland, 174 N.C. App. at 699 (citing North Carolina Dept. of

 Revenue Ad Valorem Tax Division, Business Personal Property Appraisal Manual, 7–

 17 (1995)). In Westmoreland, the Court of Appeals found that the property under

 consideration in that case did not exhibit any signs of functional obsolescence in light

 of the fact that, at least in part, the relevant electric generating facilities had

 “outstanding performance records, operate[d] above industry standards in

 production, ha[d] no environmental problems, and ha[d] been consistently profitable”

 for the taxpayer. Id. at 699–700.

¶ 27 Similarly, economic obsolescence accounts for the change in the value of the

 relevant property that “results from economic forces, such as legislative enactments

 or changes in supply and demand relationships,” NCDOR Manual Section VIII, 17,

 with such obsolescence being caused by “adverse influences arising from causes

 external to the machinery and equipment” such as social and legislative changes,

 general economic changes, considerations of supply and demand, and changes in

 prices and profitability. Id. at 19–20. “The most common causes of economic

 obsolescence in machinery and equipment are the changes in market demand for

 products being manufactured by the equipment and also the general economic

 conditions that are present.” Id. at 30. Ordinarily, economic depreciation is

 estimated using either the “comparable sales” method, in which the analyst examines
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

market sales of similar equipment, or by capitalizing income losses, id., with the

Commission having essentially adopted the second of these two approaches in this

case. As the Department of Revenue has stated:

 The shortage of current market data in comparable sales
 has caused appraisers to search for other ways to quantify
 economic obsolescence in machinery and equipment.
 Market data often does not represent true value
 transactions . . . . Most equipment in the used equipment
 market is there because of liquidation, bankruptcy or other
 causes which could very well influence the sales price of the
 equipment. . . . It should be noted that many of the sales
 transactions on used equipment will not reflect true
 market value and as such, are not appropriate for ad
 valorem tax valuations.

 As has been stated, machinery and equipment derives its
 value from its ability to generate a normal, profitable
 income to its owners during the expected useful life of the
 equipment. When the market demand for a product drops,
 causing income to be less than normal, the value of the
 equipment is affected.

 If market demand for a product drops, the degree to which
 the lack of product demand affects the value of the
 equipment (or the economic obsolescence), can be
 calculated by analyzing the current operating statements
 of the business and comparing them to expected
 statements at normal demand levels.

Id. As a result, the generally accepted methods for determining whether an

adjustment for economic obsolescence should be made include an evaluation of the

relative profitability of the specific business whose property is being valued, a fact

that justifies a focus upon the profitability of that business. However, in spite of this
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 admonition to avoid using the “comparable sales” method in instances in which it

 fails to reflect “true market value” of the relevant property and the Commission’s

 apparent decision to accept this logic in its order, Harris Teeter argues that the Court

 of Appeals erred by taking its favorable economic performance into consideration in

 upholding the Commission’s “true value” determination and contends that the

 evidence concerning the prices for used grocery store equipment in the secondary

 market necessitates an additional depreciation-related adjustment for economic

 obsolescence.5

¶ 28 The issue before the Court in this case is not a new one. In AMP, this Court

 examined the lawfulness of the Commission’s decision to uphold the manner in which

 Guilford County valued the portion of an electronics manufacturer’s business

 personal property that consisted of in-process inventory and raw materials. 287 N.C.

 at 555, 559. Although the taxpayer offered evidence tending to show that its raw

 materials were “so unique” that it got “nothing but scrap [metal] for them,” so that

 the “raw materials and in-process inventories had a true value in money equivalent

 to their scrap value,” which was “how much cash could be derived from the sale of the

 subjects, that is the underlying materials, that are available for sale if they should be

 5 Although Harris Teeter mentions the issue of functional obsolescence in its brief, its

 legal attack upon the Commission’s order focuses upon the issue of economic obsolescence
 and fails to explicitly explain how the Commission erred in the course of addressing the issue
 of functional obsolescence. As a result, the discussion contained in the remainder of this
 opinion will focus upon the Commission’s treatment of the issue of economic obsolescence.
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 sold at that date in their present state,” id. at 556–57, we rejected that argument,

 stating that the taxpayer’s

 theory that the only value its inventories had was scrap
 value . . . [was] based on the assumption, obviously
 fictional, that on 1 January of each year it is required to
 sell all of its inventory, whether such inventory is in raw
 material or in an in-process state, to the only possible
 buyers of such materials, the scrap mills.

 Id. at 567–68. As a result, we held that (1) the true value of “true scrap metal,” which

 consisted of materials that could not be used to create electronics and simply had to

 be discarded, equaled the prices for which such items could be sold in the scrap metal

 market; (2) the true value of “non-defective in-process inventory,” which consisted of

 incomplete, in-process electronics that would, upon completion, be sold to consumers,

 equaled “the cost of replacing the inventory, plus labor and overhead”; and (3) the

 true value of “non-damaged, raw material inventory,” which consisted of undamaged

 brass and copper coils that could be converted into electronics for subsequent sale to

 consumers, equaled “the cost of replacing such inventory on the critical date.” Id. at

 569–75.

¶ 29 In affirming the Commission’s determination that non-defective in-process

 inventory should not be appraised using the market price of scrap metal, we pointed

 out that “the record is totally devoid of any evidence that AMP ‘usually’ and ‘freely’

 sold such materials back to its suppliers for scrap prices” and that “the evidence is

 that AMP NEVER made such sales.” Id. at 570. In addition, we noted that “it would
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 be ridiculous” to sell in-process inventory for scrap and that “no on-going business

 entity would adopt such a sales plan,” which would result in the receipt of

 substantially less money for such property than the property would bring as a

 finished product. Id. After acknowledging that the record tended to show that there

 was no direct market for in-process inventories or raw materials, we stated that “the

 mere fact that there is no market for a particular property does not deprive it of

 ‘market value,’ [or] ‘true value,’ ” and that “[m]arket value can be constructed of

 elements other than sales in the market place.” Id. at 571. For that reason, we

 concluded that it would be appropriate to utilize valuation principles derived from

 cases involving damaged personal property and the valuation of stock in order to

 determine the “true value” of in-process inventory and raw materials. Id. at 572–73.

¶ 30 After reaching this conclusion, the Court went on to compare the value of the

 taxpayer’s in-process inventory to the measure of damages associated with the loss of

 personal property for which there was no market, stating that:

 Cost of replacement or repair, with suitable adjustments
 for the fact that the damaged or destroyed property was old
 and had depreciated in value, is perhaps, as previously
 noted, the most commonly considered factor in fixing value
 of personal property that has no market. The usual
 formula employed for determining the value of the
 destroyed property in such cases deducts the accrued
 depreciation on the damaged property from the
 replacement costs.
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 Id. at 572 (citations omitted). As a result, the Court essentially approved the use of

 “replacement cost less depreciation” in order to value the taxpayer’s in-process

 inventory rather than requiring the use of the market prices available for the relevant

 materials in the scrap metal market.

¶ 31 On the other hand, in IBM II, the Court of Appeals reviewed the Commission’s

 decision to uphold the manner in which Durham County assessed the taxpayer’s

 business personal property, including certain computers and computer equipment,

 and held that the county’s initial assessment did not produce “true value.” 201 N.C.

 App. 343. In order to determine the “true value” of the relevant property, Durham

 County had determined the original cost of the property in question and then adjusted

 it using a schedule that had been prepared by the Department of Revenue. Id. at

 344. In spite of the fact that the Department of Revenue had cautioned that “the

 schedules [were] only a guide” and that appraisers might “need to make adjustments

 for additional functional or economic obsolescence,” Durham County simply applied

 the numbers derived from the schedule to the original cost of the relevant items of

 property without doing anything more. Id. at 344–45. In upholding the validity of

 the taxpayer’s assertion that the appraisal method that Durham County utilized in

 the instance before it in that case did “not produce a ‘true value’ or ‘fair market value’

 for its equipment, because the schedule [did] not properly account for functional or

 economic obsolescence present in the 2001 computer and computer equipment
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 market,” id. at 347, the Court of Appeals concluded that the Commission had failed

 to “adequately track[ ] the detailed burden-shifting analysis required by” the relevant

 case law or to “adequately address key issues necessary to arrive at the ultimate

 decision” that it was required to make, which was “[w]hat is the market value of the

 property being appraised,” resulting “in conclusions which lack evidentiary support

 and are therefore arbitrary and capricious.” Id. at 349 (citing N.C.G.S. § 105-283).

¶ 32 A careful examination of the logic adopted by this Court in AMP and by the

 Court of Appeals in IBM II suggests that, on the one hand, the Commission does not

 err by rejecting a method for determining “true value” that places exclusive, or even

 principal, reliance upon market sales and is, instead, entitled to consider the extent

 to which prices revealed by sales in particular markets are abnormally low or high as

 the result of external factors. For that reason, Harris Teeter’s implicit argument that

 market sales should be deemed controlling in the context of determining “true value”

 was squarely rejected by this Court in AMP. On the other hand, the Court of Appeals

 correctly held in IBM II that “true value” cannot be properly determined by

 mechanically applying generic schedules without making sure that those schedules

 fairly and accurately reflect the conditions that the taxpayer actually faces. As a

 result, the ultimate lesson to be learned from AMP and IBM II is that there is no

 single required method for determining “true value” and that a proper “true value”
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 determination must rest upon a careful analysis of all relevant factors. In our

 opinion, the Commission did exactly that in this instance.

¶ 33 The ultimate issue that confronts us in this case is whether the Commission’s

 findings and conclusions have a “rational basis in the evidence,” In re McElwee, 304

 N.C. at 87, or whether they are “supported by substantial evidence,” In re

 Westmoreland, 174 N.C. App. at 697, and whether those findings support the

 Commission’s ultimate determination with respect to the issue of true value. In

 concluding that the County had made the necessary evidentiary showing, the

 Commission placed principal reliance upon the testimony provided by Mr. Turner,

 who stated that he had utilized the cost approach, the market, or “comparable sales,”

 approach, and the income approach in valuing the relevant used grocery store

 equipment; that he had been able to use the market approach to value some of the

 more mobile and self-contained items, such as shopping carts and forklifts; that most

 of the larger items, such as refrigerated cases and coolers, had high delivery and

 installation costs and utilized the same refrigerant system; that these factors made

 the use of the market approach to value these items of property unreliable; and that

 he had used the “cost method” to value the remaining items. As we have already

 noted, the Commission also found that

 15. Mr. Turner testified that he identified additional
 functional obsolescence in computer-based equipment
 and further depreciated the value of those assets in
 order to account for the additional loss in value. He
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 testified that he accelerated the depreciation on
 certain types of equipment as a result of information
 he received from the Appellant’s staff—that some
 equipment was replaced before the end of its normal
 useful life because of severe use of that equipment. . . .
 Mr. Turner testified further that he had personally
 developed income-based values in order to determine
 for himself whether the subject property was
 producing an appropriate return for the Appellant,
 and determined that the subject property produced
 income greater than standard for the industry. His
 conclusion, therefore, is that the subject property does
 not exhibit economic obsolescence, and we agree. The
 property’s apparent capacity to generate income
 greater than the industry standard is not an
 indication of economic obsolescence.

Based upon these findings, the Commission concluded that “the county’s value of

$21,434,313 is not only supported by Mr. Turner’s appraisal, but also is a reasonable

estimate of true value.” In other words, the Commission treated the issue of the

extent to which an adjustment should be made to the original cost of Harris Teeter’s

property for economic obsolescence as a question of fact to be determined on the basis

of the record evidence and reached a result that even our dissenting colleagues appear

to concede has sufficient support in the record evidence. As a result, after carefully

examining the record, we hold that the Commission’s findings with respect to the

issue of functional and economic obsolescence, which rely upon Mr. Turner’s

testimony that, with certain limited exceptions, he did not detect the presence of

functional obsolescence and that his evaluation of Harris Teeter’s economic

performance precluded the need for an adjustment for economic obsolescence, have
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 sufficient evidentiary support and support the Commission’s conclusion that the

 County satisfied its obligation to rebut Harris Teeter’s challenge to the validity of its

 appraisal methodologies.

¶ 34 We do not find Harris Teeter’s contentions that the low prices of used grocery

 store equipment in the secondary market require the making of a further adjustment

 for economic obsolescence and that the Commission erred by relying upon Harris

 Teeter’s favorable economic performance in concluding that such economic

 obsolescence did not exist to be persuasive. Such an argument assumes that, as a

 matter of law, there is one, and only one, way to calculate economic obsolescence in

 spite of the fact that the relevant statutory language contemplates the use of

 generally accepted valuation principles and the fact that the approach that the

 Commission adopted for use in this case is fully consistent with both generally

 accepted valuation principles and the accounting and economic evidence in the

 record. For that reason, we believe that acceptance of Harris Teeter’s argument

 would be inconsistent with the relevant statutory language and require us to engage

 in an impermissible exercise of appellate factfinding.

¶ 35 In addition, we believe that Harris Teeter’s arguments rest upon an erroneous

 understanding of the nature of economic obsolescence. As we have previously

 demonstrated, economic obsolescence stems from the effects of economic conditions

 external to the property under consideration, such as social and legislative changes,
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 current economic conditions, the taxpayer’s ability to use the property to make a

 profit, and similar factors. According to the Department of Revenue, market prices

 “often do[ ] not represent true value transactions” given that “[m]ost equipment in

 the used equipment market is there because of liquidation, bankruptcy or other

 causes,” which drastically reduces the equipment’s market price. NCDOR Manual

 Section VIII, 30. In such instances, “sales transactions on used equipment will not

 reflect true market value and as such, are not appropriate for ad valorem tax

 valuations.” Id.

¶ 36 As Mr. Rolnick admitted in his testimony before the Commission, Harris

 Teeter’s used grocery store equipment goes “to liquidation or . . . the dumpster” at the

 end of its useful life. Our review of the record does not provide any basis for believing

 that the used grocery store equipment at issue in this case had reached the end of its

 useful life. In addition, Mr. Rolnick acknowledged that the market for used grocery

 store equipment had been flooded with such property, a fact that greatly reduced the

 prices that were being received in that market. In light of this set of facts, which

 appear to be undisputed, the record clearly supports the Commission’s determination

 that the prices received for the sales of comparable items of used grocery store

 equipment in the secondary marketplace upon which Mr. Rolick relied did not provide

 reliable evidence of economic obsolescence and certainly does not compel a conclusion

 to the contrary. As in AMP, the record here “is totally devoid of any evidence that
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

 [the taxpayer] ‘usually’ and ‘freely’ [bought or] sold such” used equipment in the

 marketplace and did not require the Commission to value the used equipment at its

 secondary market price. 287 N.C. at 570.

¶ 37 Moreover, the Department of Revenue has determined that “analyzing the

 current operating statements of the business and comparing them to expected

 statements at normal demand levels” is an appropriate way to determine if the

 business’ property is economically obsolescent, with an additional depreciation

 adjustment for economic obsolescence being appropriate in the event that the return

 that the business is earning is lower than one would otherwise expect. NCDOR

 Manual Section VIII, 30. The testimony provided by Mr. Turner tends to show that

 the equipment used in Harris Teeter’s grocery stores generated “a rate of return on

 their assets and on equity” that was “above industry standards,” with this being the

 sort of evidence that is ordinarily considered in determining whether an adjustment

 of economic obsolescence needs to be made. As a result, the record contains ample

 justification for the Commission’s decision to consider the profitability of Harris

 Teeter’s stores in determining whether an additional adjustment for economic

 obsolescence would be appropriate, given that the value of business personal property

 “derives its value from its ability to generate a normal, profitable income to its owners

 during [its] useful life,” NCDOR Manual Section VIII, 30, and that no such

 adjustment needed to be made in this instance.
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

¶ 38 Although Harris Teeter argues that, in this case, “[a]s in IBM II, the County

 failed to produce a valid explanation for its failure to make the required adjustments”

 for depreciation due to functional and economic obsolescence and that, as was the

 case in IBM II, “[t]he failure to make additional depreciation deductions due to

 functional and economic obsolescence due to market conditions results in an

 appraisal which does not reflect ‘true value,’ ” 201 N.C. App. at 354 (2009), we have

 no hesitation in concluding that the record in this case appears to be markedly

 different from the one that was before the Court of Appeals in IBM II. As we

 understand IBM II, the County applied a governmentally developed schedule to the

 original cost of the relevant property without making any additional adjustments

 despite the fact that the schedule upon which the County relied stated that the

 analyst might “need to make adjustments for additional functional or economic

 obsolescence” and that the Commission, rather than engaging in the burden-shifting

 analysis required by AMP, simply asserted that the County had met its “burden.” In

 this case, on the other hand, the testimony of Mr. Turner, which tended to show that

 he made significant adjustments to the cost of certain items of Harris Teeter’s

 property and that he had fully considered the extent to which additional adjustments

 needed to be made to appropriately account for functional and economic obsolescence,

 constituted substantial evidence that he appropriately considered both functional

 and economic obsolescence in his appraisal, an analysis which is fully reflected in the
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Opinion of the Court

Commission’s findings and conclusions. Although the record does, of course, contain

evidence that would have supported a contrary conclusion, the Commission, rather

than this Court, has the fact-finding responsibility in this case. In other words, rather

than being an issue of law, we conclude that the issue before the Commission in this

case was one of fact, which the Commission resolved in a manner that had ample

record support. As a result, for all of these reasons, hold that none of Harris Teeter’s

challenges to the Commission’s order have any merit and that the Court of Appeals’

decision to uphold its lawfulness should be affirmed.6

 AFFIRMED.

 6 Harris Teeter did not argue before this Court that the Commission used a non-
uniform method for valuing its property, N.C. Const. art. V, §2(2) (2(2), or violated any other
tax-related constitutional provision, see Harris v. Harris, 307 N.C. 684, 690 (1983) (stating
that, “[w]hen a party fails to raise an appealable issue, the appellate court will generally not
raise it for that party”) (citing Henderson v. Matthews, 290 N.C. 87 (1976)); Crockett v. First
Fed. Sav. & Loan Ass’n of Charlotte, 289 N.C. 620, 632 (1976) (stating that, in accordance
with N.C.R. App. P. 28, “appellate review is limited to the arguments upon which the parties
rely in their briefs”), and there does not appear to be any evidence that the Commission failed
to apply the valuation principles used in this case to other taxpayers or to utilize the same
justification for refusing to make an adjustment for economic obsolescence in other cases.
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Berger, J., dissenting

 Justice BERGER dissenting.

¶ 39 I fully join in Justice Barringer’s dissent but write separately because “[a]

 frequent recurrence to fundamental principles is absolutely necessary to preserve the

 blessings of liberty.” N.C. Const. art. I, § 35.

 The admonition of the Constitution requiring frequent
 recurrence to fundamental principles is politically
 sound. . . . We violate no precedent in referring to the
 important function these guaranties of personal liberty
 perform in determining the form and character of our
 Government. . . . If those whose duty it is to uphold
 tradition falter in the task, these guaranties may be
 defeated temporarily, or permanently lost through
 obsolescence.

 State v. Harris, 216 N.C. 746, 762–63, 6 S.E.2d 854, 865–66 (1940).

¶ 40 The non-uniform valuation method employed by the government and

 sanctioned by the majority is constitutionally suspect and detrimental to economic

 liberty. See N.C. Const. article V, § 2(2) (“No class of property shall be taxed except

 by uniform rule, and every classification shall be made by general law uniformly

 applicable[.]” (emphasis added)); article I, § 1 (“We hold it to be self-evident that all

 persons are created equal; that they are endowed by their Creator with certain

 inalienable rights; that among these are life, liberty, the enjoyment of the fruits of

 their own labor, and the pursuit of happiness.” (emphasis added)); and article I, § 19

 (“No person shall be . . . in any manner deprived of his life, liberty, or property, but
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Berger, J., dissenting

 by the law of the land. No person shall be denied the equal protection of the laws[.]”).

¶ 41 As noted in Justice Barringer’s dissent, imposition of a “success tax” is

 problematic. The “uniform appraisal” of the subject property’s “true value” should be

 based on fair market value, i.e., “the price estimated in terms of money at which the

 property would change hands between a willing and financially able buyer and a

 willing seller[.]” N.C.G.S. § 105-283 (2019). The valuation method employed by

 Harris Teeter’s expert relied on information derived from sales of used equipment on

 eBay and other existing markets – exactly the circumstances contemplated by the

 statute. This statutorily acceptable valuation method produced an appraised “true

 value” of $13,663,000.00.

¶ 42 In contrast, the valuation method employed by the government bore little

 resemblance to the statutorily prescribed method. The government’s expert testified

 that, rather than consulting prices derived from sales of similar equipment in existing

 markets, he “use[d] [Harris Teeter’s] earnings to determine whether or not there was

 economic obsolescence[.]” The government’s expert determined that Harris Teeter’s

 “rate of return on the assets[,]” which was “above industry norms,” supported his

 conclusion that the “equipment didn’t suffer any external obsolescence[.]” In other

 words, because the government deemed Harris Teeter to be a successful company,

 the government determined they must be treated differently.
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Berger, J., dissenting

¶ 43 Here, the government created an artificial valuation of the subject property.

 As a result, this non-uniform, statutorily unacceptable valuation method produced

 an appraised value of $22,100,000.00 – more than $8,000,000.00 higher than the

 value produced by Harris Teeter’s expert. The valuation method employed by the

 government ignores existing markets for used business equipment, creates an

 artificial market for said equipment to exact additional monies from taxpayers, and

 treats taxpayers differently based solely on profitability. The fact that a practice may

 be widespread does not make it constitutionally permissible. Here, the government

 deprives Harris Teeter of property in the form of profits through use of a valuation

 method that appears inconsistent with our State Constitution.

¶ 44 “ ‘All taxes on property in this State for the purpose of raising revenue are

 imposed under the rule of uniformity.’ ” Hajoca Corp. v. Clayton, 277 N.C. 560, 567–

 68, 178 S.E.2d 481, 486 (1971) (quoting Roach v. Durham, 204 N.C. 587, 591, 169 S.E.

 149, 151 (1933)); see also N.C. Const. article V, § 2(2). “The fundamental right to

 property is as old as our state. . . . From the very beginnings of our republic we have

 jealously guarded against the governmental taking of property.” Kirby v. N.C. Dep’t

 of Transp., 368 N.C. 847, 852–53, 786 S.E.2d 919, 923–24 (2016) (citing John Locke,

 Two Treatises of Government 295 (London, Whitmore & Fenn et al. 1821) (1689) (“The

 great and chief end, therefore, of men’s uniting into commonwealths, and putting
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Berger, J., dissenting

 themselves under government, is the preservation of their property.”).

¶ 45 “This Court’s duty to protect fundamental rights includes preventing arbitrary

 government actions that interfere with the right to the fruits of one’s own labor.”

 King v. Town of Chapel Hill, 367 N.C. 400, 408, 758 S.E.2d 364, 371 (2014) (citing

 N.C. Const. art. I, § 1). The “fundamental guaranties” of Article I, section 1, which

 include the guarantee to the fruits of one’s own labor, are “very broad in scope.” State

 v. Ballance, 229 N.C. 764, 769, 51 S.E.2d 731, 734 (1949).

 The fundamental purpose for [the Declaration of Rights’]
 adoption was to provide citizens with protection from the
 State’s encroachment upon these rights. Encroachment by
 the State is, of course, accomplished by the acts of
 individuals who are clothed with the authority of the
 State. . . . We give our Constitution a liberal interpretation
 in favor of its citizens with respect to those provisions
 which were designed to safeguard the liberty and security
 of the citizens in regard to both person and property.

 Corum v. University of North Carolina, 330 N.C. 761, 782–83, 413 S.E.2d 276, 290

 (1992) (citations omitted).

¶ 46 The case sub judice presents an even more compelling argument for a violation

 of Article I, section 1 than in the recently decided case of Tully v. City of Wilmington,

 370 N.C. 527, 810 S.E.2d 208 (2018). In Tully, this Court held that to state a proper

 claim grounded in Article I, section 1, a public employee must establish: “(1) a clear,

 established rule or policy existed regarding the employment promotional process that
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Berger, J., dissenting

 furthered a legitimate governmental interest; (2) the employer violated that policy;

 and (3) the plaintiff was injured a result of that violation.” Id. at 537, 810 S.E.2d at

 216.

¶ 47 We are concerned here, not with an “established rule or policy[,]” but rather

 with fundamental rights guaranteed by our Constitution and a plainly worded

 statutory provision. See N.C. Const. article V, § 2(2); article I, § 19; and N.C.G.S. §

 105-283 (setting forth the “[u]niform appraisal standards” of “[a]ll property, real and

 personal.” (emphasis added)). The violation of these fundamental rights by the

 government has deprived Harris Teeter of their profits, i.e., the fruits of their labor.

¶ 48 Beyond the immediate impact on Harris Teeter, this valuation method will

 curtail economic liberty and produce inconsistent and undesirable results for

 businesses in this State. Any business that earns a “rate of return on the[ir] assets”

 which is “above industry norms” risks the government effectuating an extra-statutory

 taking of the fruits of their labor, and this Court should decline to sanction such

 action. See King, 367 N.C. at 408, 758 S.E.2d at 371 (“This Court’s duty to protect

 fundamental rights includes preventing arbitrary government actions that interfere

 with the right to the fruits of one’s own labor.”).

¶ 49 I respectfully dissent.

 Chief Justice NEWBY and Justice BARRINGER join in this dissenting
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Berger, J., dissenting

opinion.
 Justice BARRINGER, dissenting.

¶ 50 I join Justice Berger’s dissent, but nonetheless write separately to specifically

 address the errors of the North Carolina Property Tax Commission.

 I. Prologue

 “A tax is a fine for doing well, a fine is a tax for doing wrong .”

 Mark Twain

¶ 51 In this matter, the North Carolina Property Tax Commission without any

 statutory or pertinent legal authority, and perhaps inadvertently but nonetheless

 inexorably, effectively imposes a “success tax” under which the taxpayer’s economic

 success relative to applicable industry standards subjects it to higher business

 personal property valuations and thus higher property tax liabilities. This is not

 sound tax policy nor law. It conflicts with the uniform appraisal standard established

 by our constitution and by statute requiring that all personal property “shall as far

 as practicable be appraised or valued at its true value in money.” N.C.G.S. § 105-283

 (2019). The profitability or revenue production of a successful taxpayer should not

 and, under constitutional and statutory principles, cannot impose higher valuation

 and property tax payments vis-à-vis a less successful taxpayer.

 II. Background

¶ 52 In this matter, the Commission concluded that the taxpayer had “offered

 competent, material, and substantial evidence that the County’s value of the subject

 property substantially exceeded the true value of the subject properties, when the
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Barringer, J., dissenting

 [taxpayer] produced evidence tending to show that the true value of the subject

 properties was actually about one-third (1/3) less than the County’s value, according

 to an appraisal developed by its expert witness.” Nevertheless, the Commission

 ultimately though circuitously concluded that “[t]he County demonstrated that its

 methods in appraising the subject property produced true values when it provided

 evidence that the true values of the subject property, considering all forms of

 depreciation, was consistent with the County’s values for the subject property.” Not

 surprisingly, the County’s evidence—its expert’s appraised valuation—are consistent

 with the County’s previously assessed values.

¶ 53 Both parties generated value opinions for the subject property based on the

 cost approach, beginning with the original installed costs for each item of the subject

 property, and then made adjustments to the cost. Where the value opinions diverge

 occurs in the consideration of “[t]he effect of obsolescence on the property,” N.C.G.S.

 § 105-317.1(a). The taxpayer’s appraisal apparently found obsolescence for all the

 subject property due to the current rampant and competitive nature of the grocery

 store industry’s need to upfit every six to seven years.

¶ 54 The taxpayer’s expert relied on depreciation tables compiled from data

 concerning sales of used equipment and concluded that the difference between the

 equipment new and used as reflected in the table calculations is the amount of

 physical depreciation and obsolescence for the property. Essentially, the taxpayer’s

 position and testimony of its expert were that true value in money is the actual
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Barringer, J., dissenting

 market value for the used property and pointed to the economic factors of high supply

 from store closures, mergers, and remodeling and minimal demand due to fewer store

 openings.

¶ 55 On the other hand, the County’s expert deducted physical depreciation and

 tested for obsolescence. He employed the income approach to test for economic

 obsolescence. Because he found that the rate of return for the subject property

 exceeded the standard for the industry, he concluded that the subject property did

 not exhibit economic obsolescence. The County’s expert also testified that from his

 research, most companies in the industry with the ability to buy do not buy in the

 secondary market. Thus, in his opinion, the market for used equipment is for a buyer

 who buys everything at once as a continuing operation. Based on any layman’s

 definition of supply and demand, fewer buyers in a used equipment market buying in

 large quantities should produce LOWER prices and thus LOWER “true values.” The

 Commission agreed with the County’s expert, concluding that “[t]he property’s

 apparent capacity to generate income greater than the industry standard is not an

 indication of economic obsolescence.”

 III. Analysis

¶ 56 While the Commission’s finding appears to be in accord with the tax and

 accounting standards for identifying economic obsolescence, see Connor J. Thurman

 & Robert F. Reilly, What Tax Lawyers Need to Know about the Measurement of

 Functional and Economic Obsolescence in the Industrial or Commercial Property
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Barringer, J., dissenting

 Valuation (Part 1), 35 Prac. Tax Law. 11, 16–18 (2020), allowing or disallowing an

 adjustment to a cost approach valuation on account of the rate of return for personal

 property conflicts with the design of a uniform appraisal standard requiring that all

 personal property “shall as far as practicable be appraised or valued at its true value

 in money.” N.C.G.S. § 105-283.

¶ 57 Decisions of the Commission are reviewed by this Court pursuant to N.C.G.S.

 § 105-345.2. N.C.G.S. § 105-345.2 (2019). “Questions of law receive de novo review,

 while issues such as sufficiency of the evidence to support the Commission’s decision

 are reviewed under the whole-record test.” In re Greens of Pine Glen Ltd., 356 N.C.

 642, 647 (2003) (citing N.C.G.S. § 105-345.2(b)). The issue here—whether a

 taxpayer’s relative economic success is determinative of economic obsolescence for a

 valuation of business personal property—is a question of law.

¶ 58 Section 105-283 of the General Statutes of North Carolina requires uniformity

 in appraisals for property taxation. N.C.G.S. § 105-283. Specifically,

 [a]ll property, real and personal, shall as far as practicable
 be appraised or valued at its true value in money. When
 used in this Subchapter, the words “true value” shall be
 interpreted as meaning market value, that is, the price
 estimated in terms of money at which the property would
 change hands between a willing and financially able buyer
 and a willing seller, neither being under any compulsion to
 buy or to sell and both having reasonable knowledge of all
 the uses to which the property is adapted and for which it
 is capable of being used.

 N.C.G.S. § 105-283.
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Barringer, J., dissenting

¶ 59 Thus, a valuation of property at true value in money does not consider who

 owns the property. See N.C.G.S. § 105-283. Rather, it is the valuation in money from

 a hypothetical transaction in a perfect market—the exchange “between a willing and

 financially able buyer and a willing seller, neither being under any compulsion to buy

 or to sell and both having reasonable knowledge of all the uses to which the property

 is adapted and for which it is capable of being used.” N.C.G.S. § 105-283.

¶ 60 Economic obsolescence “is a reduction in the value of the property due to the

 effects, events, or conditions that are external to—and not controlled by—the current

 operation or condition of the taxpayer’s property.” Connor J. Thurman & Robert F.

 Reilly, What Tax Lawyers Need to Know about the Measurement of Functional and

 Economic Obsolescence in the Industrial or Commercial Property Valuation (Part 1),

 35 Prac. Tax Law. 11, 13 (2020); see also Obsolescence, Black’s Law Dictionary (11th

 ed. 2019) (defining “economic obsolescence” as “[o]bsolescence that results from

 external economic factors, such as decreased demand or changed governmental

 regulations”). Given the definitive requirement of an external cause, economic

 obsolescence is unrelated to who owns the property, and logically, the amount of

 revenue or net profits generated by the owner of that property is not determinative

 of economic obsolescence.

¶ 61 Therefore, the fact that a specific taxpayer’s rate of return on the subject

 property exceeds industry standards does not refute the existence of economic

 obsolescence, and certainly does not justify per se higher “true values.” Economic
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Barringer, J., dissenting

 obsolescence has an external cause and an immutable internal impact, but it will not

 necessarily result in underperformance relative to industry peers. Cf. In re Colonial

 Pipeline Co., 318 N.C. 224, 229, 233–235 (1986) (finding no error in Commission’s

 approval of the Department of Revenue’s refusal to deduct from valuation opinion for

 true value an amount attributable to economic obsolescence where taxpayer’s expert

 adjusted valuation by 25.36% on the grounds that investors were demanding a rate

 of return in the market of 14% for similar investments but taxpayer’s rate of return

 was limited to 10.45% by Federal Energy Regulatory Commission).

¶ 62 Accordingly, the Commission’s conclusion to this effect, while supported by the

 County’s expert’s testimony, reflects an error of law, necessitating remand to the

 Commission for further proceedings pursuant to N.C.G.S. § 105-345.2(b)(4). See

 N.C.G.S. § 105-345.2(b)(4) (providing reversal, remand, or modification of a

 Commission’s order when the “Commission’s findings, inferences, conclusions or

 decisions are . . . [a]ffected by other errors of law”). The Commission ignored the

 statutory mandate for true value in money required by N.C.G.S. § 105-283 when

 assessing the existence and arguable impact of economic obsolescence.

¶ 63 The majority overlooks this fundamental error of law. They raise that the

 County’s expert did consider obsolescence, did make some adjustments for

 obsolescence, and did testify as to his assessment. They riddle their opinion with

 quotes from the North Carolina Department of Revenue 2007 Personal Property

 Appraisal and Assessment Manual. Yet, neither a manual issued by the North
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Barringer, J., dissenting

 Carolina Department of Revenue nor the County’s expert’s testimony is

 law. Cf. Midrex Techs., Inc. v. N.C. Dep’t of Revenue, 369 N.C. 250, 260 (2016) (giving

 only “due consideration” to the manner in which the Secretary of Revenue has

 interpreted the statutory language at issue in a published bulletin because the

 construction adopted by those who execute and administer the law is only

 persuasive); In re IBM Credit Corp., 201 N.C. App. 343, 353 (2009) (rejecting county’s

 argument that the schedule employed is legal and used by all 100 counties because

 to do so would render tax appeals limited to “determining whether or not the proper

 government schedule was employed” rather than applying the burden shifting

 analysis required by our precedent). Thus, when the testimony or publications

 conflict with N.C.G.S. § 105-283, it is this Court’s duty to remand due to a

 fundamental error in law.

 IV. Epilogue

¶ 64 As Judge Learned Hand of our Federal Second Circuit opined many decades

 ago: “Any one may so arrange his affairs that his taxes shall be as low as possible; he

 is not bound to choose that pattern which will best pay the Treasury; there is not even

 a patriotic duty to increase one’s taxes.” Helvering v. Gregory, 69 F.2d 809, 810 (2d

 Cir. 1934), aff’d, 293 U.S. 465 (1935) (quoted in United States v. Carlton, 512 U.S. 26,

 36 (1994) (O’Connor, J. concurring)).

¶ 65 Later, Judge Hand expanded this principle in his dissent in Commissioner of

 Internal Revenue v. Newman, 159 F.2d 848 (1947) by observing: “Over and over again
 IN RE HARRIS TEETER, LLC

 2021-NCSC-80

 Barringer, J., dissenting

 courts have said that there is nothing sinister in so arranging one’s affairs as to keep

 taxes as low as possible. Everybody does so, rich or poor; and all do right, for nobody

 owes any public duty to pay more than the law demands: taxes are enforced exactions,

 not voluntary contributions. To demand more in the name of morals is mere cant.”

 Id. at 850–51 (Hand, J., dissenting).

¶ 66 I respectfully dissent.

 Chief Justice NEWBY and Justice BERGER join in this dissenting opinion.